109 N.J. Super. 166 (1970)
262 A.2d 718
CITY OF NEWARK, A MUNICIPAL CORPORATION OF NEW JERSEY, PETITIONER,
v.
DEPARTMENT OF HEALTH OF THE STATE OF NEW JERSEY, NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION, TOWN OF KEARNY, BOROUGH OF GLEN RIDGE, TOWN OF BLOOMFIELD, TOWN OF MONTCLAIR, CITY OF PASSAIC, CITY OF PATERSON, CITY OF CLIFTON AND PASSAIC VALLEY WATER COMMISSION, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 3, 1969.
Decided March 4, 1970.
*169 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Sam Weiss, Assistant Corporation Counsel, argued the cause for petitioner (Mr. Philip E. Gordon, Corporation Counsel of the City of Newark, attorney).
Mr. Theodore A. Schwartz, Deputy Attorney General argued the cause for respondent Department of Health (Mr. Arthur J. Sills, Attorney General, attorney; Mr. Stephen Skillman, Deputy Attorney General, of counsel).
Mr. Oscar R. Wilensky argued the cause for respondent North Jersey District Water Supply Commission.
Mr. Newton M. Roemer argued the cause for respondent Passaic Valley Water Commission.
Respondents Town of Kearny, Borough of Glen Ridge, Town of Bloomfield and Town of Montclair did not file briefs.
Respondents City of Clifton, City of Paterson and City of Passaic did not file briefs but rely on the arguments of respondent Passaic Valley Water Commission.
*170 The opinion of the court was delivered by MATTHEWS, J.A.D.
This matter is before the court on a petition for a declaratory judgment filed by the City of Newark pursuant to R.R. 4:88-10 (now R. 2:2-3(a)(2), 2:5-1 (c)) at the direction of Judge Mountain of the Chancery Division. In the petition the city seeks to challenge the validity of certain rules and regulations promulgated by respondent Department of Health of the State of New Jersey (Department) dealing with potable water standards, and a departmental order issued January 24, 1966 to respondent North Jersey District Water Supply Commission (North Jersey District).
Originally, the Department instituted an action in the Chancery Division seeking a mandatory injunction which would require the North Jersey District to effect immediate compliance with the January 24, 1966 order issued by the Department pursuant to the provisions of N.J.S.A. 58:11-1, et seq. That order required the North Jersey District to improve, add to or alter, before January 1, 1968, the water treatment plant located at the Wanaque reservoir which is owned and operated by it, to the end that the water contained therein should be purified in a manner approved by the Department, prior to its being distributed for potable and culinary purposes. In the Chancery Division action the Department took the position that the water collected and stored in the Wanaque reservoir and distributed to various municipalities failed and continues to fail to meet the standards of purity and potability that have been promulgated by it.
The North Jersey District filed an answer to the complaint which did not dispute the validity or legality of the order issued by the Department. It did point out, however, that it had no funds to effect construction of a filtration and purification plant of the size required under the Department's order, and, in addition, that it did not have the statutory authority to raise funds for this purpose by *171 issuing bonds or otherwise. The answer also alleged that in order for the North Jersey District to comply with the Department's order it would be necessary for it to obtain the financial backing from its constituent municipalities which receive potable water from its Wanaque reservoir. To this end, the North Jersey District sought and was granted leave to file a third-party complaint against its constituent municipalities and the Passaic Valley Water Commission.
The third-party defendants all filed answers and raised certain defenses, two of which are involved in this proceeding:
1. The potable water standards that have been promulgated by the Department and upon which its order of January 24, 1966 is based, exceed the authority of the Department as delegated to it by the Legislature and therefore, as administrative regulations, are invalid;
2. The aforementioned order of the Department is further invalid because (a) it was adopted and issued without a preliminary hearing being afforded either the North Jersey District or any of the constituent municipalities, and (b) it cannot be considered effective as against the various third-party defendants since they are not named in the order and it is not directed to any of them.
The constituent municipalities which now receive all or part of their potable water supplies from the Wanaque reservoir maintained and operated by the North Jersey District include Bloomfield, Clifton, Glen Ridge, Kearny, Montclair, Newark, Passaic and Paterson. Clifton, Passaic and Paterson actually obtain their proportionate share of this water supply through the instrumentality of the Passaic Valley Water Commission (Passaic Valley) through whose facilities it is transmitted by the North Jersey District.
After all of the aforementioned pleadings had been filed in the Chancery Division, the trial judge reached the conclusion that some of the questions raised in the answers to the third-party complaints, specifically those mentioned above, should be passed upon by this court under the provisions of *172 the rules mentioned above. He directed counsel for the third-party defendants to initiate, within 20 days from the date of his determination (December 9, 1968), "an independent plenary action in the Appellate Division under R.R. 4:88-10 and 4:88-8 for the purpose of securing a prompt review of the validity of the applicable regulations of the State Department of Health and its ensuing order." The trial judge also directed that, pending determination of the action instituted in this court, the Chancery Division action would remain in status quo. Bloomfield, Glen Ridge, Kearny and Montclair have not filed briefs in this action and have notified us that they will abide by whatever decision is made. Clifton, Passaic and Paterson have not filed independent briefs, and have informed us that they adopt the position taken by Passaic Valley in its brief. The Department, the North Jersey District and Newark have filed briefs.

THE POTABLE WATER STANDARDS
Only Newark questions the validity of the potable water standards issued by the Department. In doing so it contends that the standards are "illegal and void and beyond the power of the Department and that the Department is without power to order the highly expensive filtration of the water in the Wanaque watershed solely by reason of said water containing miniscule percentages of iron and manganese faintly affecting coloration merely, and not at all affecting public potability and health."
The standards questioned here are contained in the potable water standards promulgated by the Department and filed with the Secretary of State on August 21, 1967, to be effective October 1, 1967. The standards challenged provide, in relevant part:
3.1 Water intended for potable purposes shall not contain impurities in concentrations which may be hazardous to the health of the consumer or be corrosive to the water supply system. Substances used in this treatment shall not remain *173 in the water in concentrations greater than required by good practice. Substances which may have a deleterious physiological effect, or for which physiological effects are not known, shall not be introduced into the system in a manner which would permit them to reach the consumer.
3.2 Physical Characteristics
The physical characteristics of water intended for potable purposes shall not exceed the following limits:
a. Turbidity  not to exceed 5 part per million (Milligrams per Liter) (silica scale).
b. Color  not to exceed 10 units (standard cobalt scale).
c. Taste  the water shall have no objectionable taste.
* * * * * * * *
3.3 Chemical Characteristics
* * * * * * * *
b. The following chemical substances should not be present in a water intended for potable purposes in excess of, or (where applicable) below, the listed concentrations. Their presence may constitute grounds for the rejection of the supply if, in the opinion of this Department, such substances, either singly or in combination, are present in such concentrations as would render the water unduly corrosive, unpalatable, hazardous to the consumers or aesthetically objectionable.
 Substance Recommended Concentration
 Maximum Minimum
* * * * * * * *
 Iron (Fe) [*] 0.3 ppm (Mg/L)
 Manganese (Mn)[*] 0.05 " "
* * * * * * * *
4.1 Water intended for potable purposes shall be free from:
a. Visible organisms such as algae, algae diatoms, crustaceans, arachnids, and larvae.
b. Those micro-organisms which render the water unpalatable, or unaesthetic to the consumer.
The record before us discloses that present treatment methods at Wanaque are comprised of rough screening, p.h. adjustment by lime, and disinfection by ammonia and chlorine. There is no treatment to reduce turbidity (i.e., flocculation and sedimentation), no filtration to provide a barrier against the ingress of particulate, organic and biological matter into the distribution system, and no treatment to remove the manganese in the system. We are informed that manganese is a prime cause of dirty or black water complaints; when *174 present in the system, even in small concentrations, it has the effect of slowly oxidizing and depositing on the interior of the aqueducts and distribution systems.
It should also be observed that the Wanaque reservoir receives waters containing effluents from seven sewage treatment plants.
The Department has made various inspections of the North Jersey District facilities and, as required by N.J.S.A. 58:11-12, the North Jersey District has furnished monthly operating reports and other related information to the Department. These monthly reports contain detailed laboratory analyses of North Jersey District water sampled at various points. The charts plotted from the monthly reports which are before us indicate that the water supplied by the North Jersey District does not meet the potable water standards, set forth above, in the categories of color, turbidity and manganese. In addition, the reports disclose that there were algae present which were significant in the production of taste and odors. Turbidity was equal to or worse than the standards in 24% of the reported cases; color, in 37% of the cases; and the average manganese level was .11 ppm., or twice the recommended maximum. The North Jersey District was requested to advise the Department of its plans for more effective treatment. During mid-1965 the North Jersey District said it would study the situation. In late 1965 the United States Public Health Service downgraded the water supply in question from "approved" to "provisionally approved" and urged that definite plans for complete treatment be initiated within one year. The order before us ensued.
On February 17, 1966 the North Jersey District wrote the Department that the Commission's constituent municipalities had met to consider the January 1966 order and that a committee had been formed to prepare a preliminary report for a filter plant to correct the situation. On March 7, 1966 the North Jersey District reported to the Department that all constituent municipalities concurred with the conclusion that additional treatment of the Wanaque water was necessary *175 to comply with the potable water standards. Various alternatives were listed.
On December 15, 1966 the Department received a letter and report from the North Jersey District, the report indicating that the engineers of the Wanaque constituents had met and that they "recognized" that all of the Wanaque water must receive additional minimum treatment in the form of filtration. Then, on March 2, 1967, the North Jersey District informed the Department that it had entered into a contract with Havens and Emerson, consulting engineers, to prepare a study and report for the required filtration plant. The Havens and Emerson report was filed in December and accepted by the Department on February 1, 1968.
It was not until March 15, 1968 that Newark indicated that it would not go along with the Department. It advised that it would not approve the filtration plant, site, location and costs, as set out in the report, and based upon studies and recommendations made by its constituents the city would proceed with its filtration for the treatment of Newark's Wanaque allotment at its Belleville reservoir. We note that Newark did not question the need for filtration, but for some reason, the soundness of which escapes us, decided to go it alone. We also observe that it was not until Newark filed its answer in the Chancery Division action that any question was raised as to validity of the potable water standards and the power of the Department to promulgate them.
The safeguard of public health is an essential function of government and is of primary concern to the social order. Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9 (1958); Department of Health v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366 (App. Div. 1969), aff'd 53 N.J. 248 (1969). Without question, the State has the power, and it is its duty, to control and conserve the use of its water resources for the benefit of all its inhabitants. City of Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923).
*176 Our Legislature created the Department of Health to protect and preserve the public health and welfare of the people of New Jersey. In furtherance of this goal the Legislature has provided it with broad powers in the area of public health. In an effort to insure that the public shall receive water which is of sufficient quality, potability, wholesomeness and purity, and to protect sources of water supply, the Legislature has provided the Department with comprehensive and specific powers to supervise all sources of water supply and the operation of treatment plants and distribution systems. For example, N.J.S.A. 58:11-1 provides:
No person engaged in the distribution or sale of water for potable purposes shall deliver to any consumer any water which, in the opinion of the state department of health, hereinafter in this chapter designated as the "department," is polluted, contaminated or impure, or which is obtained from any source which, in the opinion of the department, is or may become polluted, contaminated or impure, unless purification by filtration or other means acceptable to the department shall be accomplished before the water is distributed.
And N.J.S.A. 58:11-4 provides, in part:
The department shall have the supervision of the operation of all water plants with respect to the purity of the supply of potable water furnished thereby, and every person furnishing water for potable use shall comply with any and all orders of the department relating to the purity of such waters. * * *
Newark would have Department regulations confined to matters of public health and would have us read these statutes as centering upon potability rather than purity. Indeed, it argues that the jurisdiction of the Department in the premises is based solely on potability. No persuasive authority is given us for this position. Pursued to its extreme, Newark's argument based on public health would leave us with drinking water not demonstrably injurious to human life, but having characteristics that would make it distasteful because of color, odor, flocculation and the like. We cannot admit of such a result. Water may be used for many purposes, including *177 drinking, cooking and personal cleanliness. The standards promulgated certainly can address themselves to the elements which touch upon such uses.
N.J.S.A. 58:11-4 cannot, of course, be read in a vacuum. It must be read in pari materia with all of the statutes which give powers to the Department relating to water supply. For example, under N.J.S.A. 58:11-2, no person may furnish any water for potable purposes until the source has been approved by the Department; N.J.S.A. 58:11-3 requires prior approval by the Department before a water treatment plant can be constructed or operated for the purification of waters intended for potable uses; under N.J.S.A. 26:1A-37(i) the Department is empowered to "make and enforce rules and regulations concerning plans and specifications for the construction, improvement, alteration or operation of all public water supplies * * *"; N.J.S.A. 26:2-65 requires the Department to fix standards of quality for any waters used or available for use for drinking or culinary purposes or for the cleansing of utensils used in preparing or serving food or drink for public consumption. The nature of these statutory powers is such that it must be concluded that the Department is not required to wait until actual contamination of water supplies is shown to exist. It is the duty of the Department to provide reasonable safeguards against foreseeable dangers of their contamination.
When dealing with statutes which promote public health, safety and welfare, courts traditionally apply a liberal construction with respect to supervisory and regulatory powers  and this is certainly so with regard to water meant for human uses. It is the duty of courts to see that such enactments achieve their beneficent purpose. The potable water standards questioned here provide the criteria upon which water distributors can rely to insure that the public is receiving water that is wholesome, pure, potable and of good quality. They comprise technical standards that have been adopted by an agency possessing specific expertise and which is therefore qualified to pass judgment on such matters *178 as quality, wholesomeness, purity and potability. Moreover, the record before us demonstrates that the standards in question are in conformity with those adopted by the United States Public Health Service, and that the American Water Works Association, the national association of water purveyors, not only has endorsed the United States Public Health drinking water standards but has recommended standards more stringent.
The standards promulgated are demonstrative, legislative acts. The only test to be applied here is whether such acts are reasonably related to the end sought to be achieved, and whether that end was in the power of the Legislature to achieve. We do not have the slightest hesitation in finding that the standards questioned meet that test. The burden is on petitioner to establish that they do not. Consolidation Coal Company v. Kandle, 105 N.J. Super. 104 (App. Div. 1969), aff'd o.b. 54 N.J. 11 (1969). We conclude that the Department's regulations are valid and a proper method of promulgating orders regarding the purity of water pursuant to a clear exercise of the police power by the Legislature in N.J.S.A. 58:11-4.

THE ORDER OF JANUARY 24, 1966
The attack on the order promulgated by the Department on January 24, 1966 is based principally on the fact that it was adopted and issued without a hearing. Passaic Valley argues that the order has deprived it of the opportunity to be heard as to which engineering techniques should be applied in treating the water. It points out that it has been using pressure filtration, and that the position of the Department in rejecting pressure filtration is arbitrary and ignores the satisfactory condition of Passaic Valley's water supply. It also argues that its customers will be subjected to great expense in the construction of the new filtration plant. It claims that its water presently meets the potable water standards of 1967. At another point in its brief, it *179 alternatively argues, with engineering support, that with certain modifications its existing plant would meet the potable water standards.
We note that under the Department's plan, Passaic Valley will be compensated for the partial shutting down of its facilities. However, whether Passaic Valley's treatment is adequate, whether the particular plan settled on by the Department is so economically unsound as to render the shutting down of the Passaic Valley plant an arbitrary taking without just compensation, or indeed whether Passaic Valley will be compelled to join in the construction of the new plant in substitution of its own facility, are matters to be dealt with at the plenary hearing in the Chancery Division.
The Department's order was merely to the North Jersey District to construct facilities to bring the Wanaque water into conformity with the 1967 standards. That order was a legislative action taken by an administrative agency. It was not a quasi-judicial action and clearly did not require a hearing. Indeed, N.J.S.A. 58:11-4, under which the order was issued, does not require a hearing. Cf. State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504 (E. & A. 1935); Jamouneau v. Harner, 16 N.J. 500, 522 (1954).
We have passed over the procedural questions raised by the Department relating to the timeliness of the challenges asserted here, preferring to deal with the merits because of the importance of the questions raised to the general public.
For the foregoing reasons, we sustain the validity of the standards and regulations mentioned above and the issuance of the order in question. The matter is remanded to the Chancery Division to proceed with the plenary hearing. No costs.