127 N.J. Super. 251 (1974)
317 A.2d 86
STATE OF NEW JERSEY, EX REL., DEPARTMENT OF HEALTH, PLAINTIFF-RESPONDENT,
v.
NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION, DEFENDANT AND THIRD-PARTY PLAINTIFF-RESPONDENT,
v.
CITY OF NEWARK AND PASSAIC VALLEY WATER COMMISSION, THIRD-PARTY DEFENDANTS-APPELLANTS, AND TOWN OF KEARNY, BOROUGH OF GLEN RIDGE. TOWN OF MONTCLAIR, TOWN OF BLOOMFIELD, CITY OF PASSAIC, CITY OF PATERSON, CITY OF CLIFTON, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1973.
Decided March 8, 1974.
*255 Before Judges CONFORD, HANDLER and MEANOR.
Mr. Donald Coburn, Assistant Corporation Counsel, argued the cause for third-party defendant-appellant City of Newark *256 (Mr. William Rossmoore, Assistant Corporation Counsel, on the brief; Mr. William H. Walls, Corporation Counsel, attorney).
Mr. Newton M. Roemer argued the cause for third party defendant-appellant Passaic Valley Water Commission.
Mr. Albert S. Gross argued the cause for defendant and third party plaintiff-respondent North Jersey District Water Supply Commission.
Mr. Joseph M. Clayton Jr., Deputy Attorney General, argued the cause for plaintiff-respondent State of New Jersey, ex rel. Department of Health (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
The opinion of the court was delivered by HANDLER, J.A.D.
This is the sequel to Newark v. N.J. Dept. of Health, 109 N.J. Super. 166 (App. Div. 1970). As directed therein, the court below held a plenary hearing encompassing various issues raised by appellants' attack upon the order of the State Department of Health (Department) promulgated on January 24, 1966, as well as the implementation thereof as proposed by the North Jersey District Water Supply Commission (Commission or North Jersey). This plan was approved by the Department and concurred in by all of the participating municipalities with the exception of appellants City of Newark (Newark) and Passaic Valley Water Commission (Passaic Valley).
The court below determined upon cross-motions for partial summary judgment that the participating members were required to contribute to the cost and operation of the proposed filtration plant required by the Department. It also delineated as the remaining questions to be resolved by a hearing: the reasonableness of the proposed filtration plant with respect to its capitalization requirements and the method of payment therefor, computation of the respective contributions *257 of the constituent municipalities, and compensation, if any, to Passaic Valley for damage to or loss of its filtration facilities at Little Falls. Following a full plenary hearing, the trial court entered a judgment which provided:
A. North Jersey District Water Supply Commission is ordered and directed with all possible speed to finance, construct and operate a chemical filtration plant facility in a suitable area at the Wanaque Reservoir Headworks, Wanaque, New Jersey, to serve Newark, Clifton, Paterson, Passaic, Bloomfield, Glen Ridge, Kearny and Montclair, in compliance with the mandate of the State of New Jersey, Department of Health.
B. The cost of financing, constructing and operating said filtration facility be borne and paid for by said constituent members in proportion to their percentage of ownership.
C. The North Jersey District Water Supply Commisison shall be and is hereby authorized and directed forthwith pursuant to the provisions of N.J.S.A. 58:5-1 et seq. for the purpose of financing, constructing and operating said filtration facility to issue and market its bonds secured by a pledge or lien on its revenues.
D. The North Jersey District Water Supply Commission shall pay to the Passaic Valley Water Commission $650,160, the present fair value of its Totowa Pressure Filtration Plant, as soon as feasible out of the proceeds of the bond issue aforesaid.
To sharpen the focus on this appeal, the essential issues to be resolved may be characterized as follows: (1) whether the determination that there should be a new filtration plant located at the Wanaque headworks was reasonable, in light of the effect thereof upon the interests of Passaic Valley and Newark; (2) whether Passaic Valley and Newark may be compelled to participate in the proposed filtration plant at Wanaque and to contribute a proportionate share of the costs of constructing that facility; (3) whether the award of damages for the loss sustained by Passaic Valley attributable to the anticipated abandonment of its pressure filtration plant at Little Falls was improper or inadequate, and (4) whether the directive that North Jersey could finance the proposed filtration plant through the issuance of its own bonds secured by a pledge or lien on its revenues was improper or invalid.

*258 I
Appellants have taken the position that the proposed filtration facility at the Wanaque headworks "is economically unfeasible and will be disastrous to the owner-municipalities comprising Passaic Valley and to Newark." This contention is supplemented by the further assertion that Passaic Valley "could readily improve its present facilities to meet and surpass all state standards," and that Newark could build an "entirely satisfactory" facility in Belleville and should, at the very least, have been given the opportunity "to explore this feasible approach * * *."
The trial court noted that the only comprehensive study that was undertaken in response to the Department's order of January 24, 1966 was that submitted by the consulting engineers on January 12, 1968 and accepted by the Department on February 1, 1968. The recommendation as approved by the Department was for a new filtration plant at Wanaque. The court felt compelled, "by the overwhelming evidence" reflected in the engineers' reports, to approve their recommendations and adopt their findings, noting that such evidence exceeded "clear and convincing standards of proof." In reaching that ultimate conclusion, the court rejected the alternatives advanced by Passaic Valley and Newark. In effect, it reasoned that their proposals were unfounded and inconsistent with the objectives to be achieved by the plan approved by the Department.
Our independent review of the record leads us to the same result. In reaching this conclusion we have duly noted that there is some countervailing evidence. We are also mindful of the contentions of appellants, based in some measure upon extra-record references, that the proposed plan to construct a filtration facility at Wanaque is actuated by motives to serve not primarily the demands of the inhabitants of the constituent members of North Jersey but rather to cater to the needs of other municipalities and to abet other projects, such as the proposed Monksville Project. These considerations, *259 however, do not dissuade us that the result reached by the trial court was eminently sound.
Most of the experts expressed the view that the location of a new filtration facility at Wanaque was optimum. Glen H. Abplanalp, a highly qualified expert associated with the engineering firm which had been retained by Passaic Valley and whose report was ultimately approved by North Jersey and the Department, concluded that the best location for the filtration plant was the Wanaque site at the headworks of the system. John Wilford, Chief of the Bureau of Potable Water of the State Department of Environmental Protection, underscored the State's approval of the engineers' report as to the location of the filtration plant at the Wanaque headworks. Dean C. Noll, the District's Chief Engineer, emphasized the need to meet future needs of the northeastern area of the State and that the Wanaque location has the greatest flexibility in that respect. Dr. William Oscar Lynch, a professional engineer who testified for Passaic Valley, recognized that Wanaque was the proper location for the plant (but that Passaic Valley should be adequately compensated) and that such a plant could be more economically run and constructed for less than it would cost to construct or renovate facilities at Little Falls.
Accordingly, we are satisfied that the court's determination upholding the Department's decision that a new filtration plant be constructed on the site of the Wanaque headworks was clearly reasonable and firmly based upon substantial evidence.

II
Passaic Valley and Newark assert that they cannot be compelled to participate in the water supply system entailing new filtration facilities to be located at the Wanaque headworks, nor can they be required to share proportionately with other members of North Jersey in the cost of such construction. It is argued that not only is there an absence of statutory *260 and contractual authority to force the cooperation of these objecting municipalities in the proposed facility but that such a mandate would result in an "unconstitutional taking of their property."
This controversy must be understood in the perspective of the State's overriding concern and obligation to safeguard the public health. West Caldwell v. Caldwell, 26 N.J. 9, 30 (1958); Dept. of Health v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366, 381 (App. Div. 1968), aff'd 53 N.J. 248 (1969). This encompasses a comprehensive power, coupled with a correlative duty, to control and conserve the use of its water resources for the benefit of all its inhabitants. Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923). It is a paramount governmental policy that such water supplies must be pure in quality, and be economically and prudently managed for the benefit of the public. See Collingswood v. State Water Supply Comm'n, 85 N.J.L. 673, 676 (E. & A. 1914). Designed to protect and promote the general health, safety and welfare, statutes regulating public water resources must be liberally construed to advance and achieve this underlying beneficent policy. Jersey City v. State Water Policy Comm'n, 118 N.J.L. 72, 76 (E. & A. 1937); Newark v. N.J. Dept. of Health, supra, 109 N.J. Super. at 177.
The Legislature has enacted various statutes which give the State regulatory and supervisory authority over the construction and operation of potable water supplies.[*]N.J.S.A. 58:11-1, 2 and 3 provide that no person may distribute or sell water for potable purposes which in the opinion of the *261 Department, is impure or obtained from a source which is or may become polluted; nor may any person distribute water without first obtaining from the Department approval of the source and approval of detailed plans and specifications for any water treatment facility which the Department may require. N.J.S.A. 58:11-4 further provides:
The department shall have the supervision of the operation of all water plants with respect to the purity of the supply of potable water furnished thereby, and every person furnishing water for potable use shall comply with any and all orders of the department relating to the purity of such waters. * * *
See also, N.J.S.A. 26:1A-37(i) and N.J.S.A. 26:2-65.
The State's ultimate control over its water resources is also reflected in N.J.S.A. 58:1-10 whereby the Division of Water Policy and Supply and the Water Policy and Supply Council (which succeeded to the authority of the former State Water Policy Commission pursuant to N.J.S.A. 13:1A-9) "have general supervision over all sources of potable and public water supplies * * * to the end that the same may be economically and prudently developed for public use."
Through N.J.S.A. 58:5-1 et seq. the Legislature created two water supply districts and provided the commissions (one of which is North Jersey) created thereunder with powers sufficient to develop water supplies for any municipality in the State. In the construction of this legislation, it must be borne in mind that the "purity of the state's potable water supply is * * * a pre-eminent factor" in the proper exercise of such statutory powers. Jersey City v. State Water Policy Comm'n, supra, 118 N.J.L. at 75.
By virtue of this statutory authority North Jersey is enabled to enter into contracts with municipalities for obtaining a water supply or for new or additional water supplies. N.J.S.A. 58:5-9 to 15. North Jersey is further empowered to carry out its contract with participating municipalities and to that end to construct filtration plants as may be necessary to fulfill its statutory objectives and indeed to exercise "all *262 other powers necessary or proper to provide all of the contracting municipalities * * * with a sufficient water supply * * *." N.J.S.A. 58:5-16. After the completion of its water supply plant, works and appurtenances North Jersey remains in sole control and charge thereof. N.J.S.A. 58:5-24. It also has the power to bring about municipal appropriations necessary to carry out its contract with participating municipalities, N.J.S.A. 58:5-15; and municipalities may be required to defray the costs of the construction of the water supply system as well as annual operating costs, N.J.S.A. 58:5-22, 23. In a cognate statute, the Water Transmission Facilities Act, L. 1962, c. 167, N.J.S.A. 58:5-31 et seq., which has an indirect bearing on North Jersey's statutory powers herein, such costs could include major items of repair or reconstruction. N.J.S.A. 58:5-34(8). If a municipality fails to make required appropriations, North Jersey has the option of treating the contract as abandoned by that municipality. N.J.S.A. 58:5-15. No such option, however, is given to contracting municipalities. Additionally, no participating municipality may obtain "any new or additional water supply" outside the system without the consent of North Jersey. Id.
From this statutory scheme it is not unreasonable to posit an implied power in North Jersey, as a necessary incident to the continued maintenance and operation of its water supply system in accordance with state standards as to quality and purity, to provide not only for major repairs of existing plants but also to furnish additional facilities and improvements at the joint expense of the participating municipalities. Cf. Passaic Valley Sewerage Comm'n v. Paterson, 107 N.J. Super. 436 (Law Div. 1969), aff'd 113 N.J. Super. 148 (App. Div. 1971).
The contracts between North Jersey and the member municipalities, entered pursuant to statute, are not inconsistent with a mutual and binding obligation to cooperate in the construction of additional facilities necessary to ameliorate *263 the quality of the existing water supply in order to conform with state requirements.
The contract, with respect to the original construction of the reservoir and appurtenant facilities, provides:
[T]he contracting municipality further authorizes and empowers the North Jersey District Water Supply Commission, at the expense of the contracting municipality, as hereinafter provided, to maintain, repair and operate the said reservoirs, dams, works, pipe lines or conduits, when constructed.
The preamble of the 1918 contract between Newark and North Jersey, which is typical, contemplates "the operation and maintenance of said works when completed." North Jersey is empowered to maintain at the expense of the contracting municipality the entire system when constructed. Most significantly, reflecting its explicit statutory mandate, the contract provides:
And the Commission covenants and agrees with the said contracting municipality to supply the water in the quantities and at the time above set forth, and further agrees to exercise all powers granted by the state laws to remove and prevent pollution, and any expenses incurred thereby shall be considered a part of the cost of operation and maintenance of the works herein provided for.
It is not to be assumed that these contracts are so inflexible as to leave the parties unable to deal with future contingencies. Cf. North Jersey Dist. Water Sup. v. Newark, 103 N.J. Super. 542 (Ch. Div.), aff'd 52 N.J. 134 (1968); Nelson v. Kearny, 4 N.J. Misc. 157 (Sup. Ct. 1926). Such an interpretation would deprive North Jersey of authority and financial means to provide for major repairs or the replacement or augmentation of facilities necessary to maintain the reservoir and the water supply system in compliance with lawfully adopted standards of purity. Passaic Valley Sewerage Comm'n v. Paterson, supra, 107 N.J. Super. at 440.
We may agree with appellants that the contracts entered into pursuant to N.J.S.A. 58:5-1 et seq. are not *264 directly affected by the additional statutory powers conferred on North Jersey by the Water Transmission Facilities Act. These provisions, however, are in pari materia with the statutory authority governing the relationship between North Jersey and its constituents. The rather explicit authority of the 1962 act to enable North Jersey to construct additional projects, including filtration facilities, relating to the transmission of water made available by the State does not militate against the reasonable and necessary implication of a comparable authority to provide new facilities when needed as an integral part of its present water system. Moreover, we are not persuaded that the contracts, in the light of the operative statutes, as well as the circumstance that later contracts were entered into supplementing the 1918 and 1924 agreements, compel the execution of new agreements before this additional construction  required by the State to continue the proper operation of the present water supply system  can be undertaken.
It is to be emphasised that the proposed filtration plant is clearly not a new water supply project, for which a new contract might arguably be necessary. The engineers' report itself has characterized "the construction of pretreatment facilities followed by filtration" as being "in addition to * * * existing water treatment facilities." Indeed appellants do not reject the premise that very substantial physical improvements are required to improve the quality of water in the present water supply system. Rather the quarrel is only over technique and methodology, appellants preferring respectively to build a new filtration plant to service Newark and to upgrade the pressure plant at Little Falls in the case of Passaic Valley. Mindful that the lower court reasonably found on the record no substantial evidence in support of these alternatives, we conclude that the judgment below upholding the order of the Department implementing the plan of North Jersey for the construction of a new filtration plant at Wanaque headworks, with the required participation of its *265 local members, was correct and was consonant with applicable statutory and contractual authority.

III
Appellants contend that just compensation was required since their compulsory participation in the building of "new filtration facilities at the Wanaque headworks constituted an unconstitutional taking of their property" and that the damages awarded by the court below are inadequate.
We do not understand the lower court, in making a damage award to Passaic Valley, to have determined that appellants were entitled to compensation on the theory that what occurred was an inverse condemnation of their property, in particular Passaic Valley's filtration plant at Little Falls. Nor do we perceive any basis for regarding the plan adopted by the Department as "so economically unsound as to render the shutting down of the Passaic Valley plant an arbitrary taking without just compensation * * *." Newark v. N.J. Dept. of Health, supra, 109 N.J. Super. at 179. As previously indicated, the contrary conclusion  that the plan is economically sound and reasonable  is amply supported by this record.
The asserted economic injury expected by appellants cannot be equated with a taking of their property. A proper exercise of the police power does not give rise to a right to compensation even though the value of property may consequently be reduced. State v. Mundet Cork Corp., 8 N.J. 359, 371, cert. den. 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637 (1952). It is unquestionably within the State's police power to control and conserve the use of its water resources for the general welfare. Trenton v. New Jersey, supra, 262 U.S. at 185, 43 S.Ct. 534. To that end, the State may establish standards for potable water quality and direct distributors of potable water to take steps necessary to achieve compliance with those standards. Newark v. N.J. Dept. of Health, supra, 109 N.J. Super. at 176. When the State acts *266 pursuant to the police power to provide safe and adequate potable water supplies through the improvement of existing facilities, including new construction, the consequences to others who are injured or disadvantaged because of the resultant competition or obsolescence of their existing facilities are not such as to require compensation under the State or Federal Constitutions. See Denver v. New York Trust Co., 229 U.S. 123, 142-143, 33 S.Ct. 657, 57 L.Ed. 1101 (1913); Madera Waterworks v. Madera, 228 U.S. 454, 456, 33 S.Ct. 571, 57 L.Ed. 915 (1913). See also Bayshore Sewerage Co. v. Dept. of Environmental Protection, 122 N.J. Super. 184, 207 (Ch. Div. 1973).
Against this backdrop the award of $650,160 to Passaic Valley as damages or compensation for the abandonment of Passaic Valley's Little Falls pressure filtration plant was neither unjust nor unfair. The court made this award essentially on the basis of Abplanalp's testimony, with certain adjustments. It represents the replacement cost of the filtration plant less depreciation.
Passaic Valley contends that this value is "only a small part of its damages" and "does not take into account the total amount of the loss sustained by Passaic Valley." The additional loss, according to Passaic Valley, is occasioned by the order of the court that it "join the proposed project at the Wanaque headwaters." Therefore, it reasons that the true and full measure of value must necessarily "include [not only] the value of Passaic Valley's present plant * * * [but also] the capitalized value of the additional expense it will sustain."
Passaic Valley makes much of the reference in the engineering report and the mention by Abplanalp in his testimony that the "capitalized difference in water cost" to Passaic Valley might represent a more equitable approach. Three experts offered by Passaic Valley utilized a capitalization of expenses approach and estimated damages at $6,108,900, $6,006,900 and $4,812,500, respectively.
*267 We concur in the rejection of these valuations by the trial court on the ground that they were speculative and conjectural. The estimated increased costs to Passaic Valley resulting from its participation in the new Wanaque facility were subject to many variables which were dependent upon several interrelated factors. Their evaluation would entail, according to Abplanalp, considerable comparative studies of the Little Falls plant and the proposed facility, analysis of direct operating expenses and costs of maintenance and administration of the Little Falls plant, the capital costs as well as the operating expenses for any pretreatment facility which would be required at Little Falls, and other like factors. Moreover, as noted by the court, the "capitalized earnings theory expounded and amplified by Passaic Valley's experts * * * is grounded on assumed facts" which were not otherwise established. These related to improvements which would have to be made to the Little Falls plant in order to satisfy state criteria and potability standards. For valuation purposes we would agree that the court was on sound footing when it concluded that such improvements of the Little Falls plant were theoretical and probably would not be sufficient to warrant state approval and, therefore, were in the "realm of speculation."
Thus, in view of the absence of any constitutional or statutory basis for awarding damages as just compensation, and in light of the evidence presented, it would appear that the damages awarded by the court to be paid by North Jersey to Passaic Valley, as an incident to the overall plan for providing acceptable water involving all of North Jersey's constituent municipalities, was reasonable.

IV
It is contended that error was committed in authorizing North Jersey to issue bonds and pledge anticipated revenues to finance the proposed filtration plant. We may pass the argument that this question was not a trial issue since it *268 involves essentially legal considerations. It was apparently conceived by the court as a supplementary or additional method for financing the costs of the construction of the proposed filtration plant.
The power to issue bonds in order to finance the construction of needed facilities may be reasonably implied. The original act, N.J.S.A. 58:5-1 to 30, contains no explicit authority for North Jersey to issue its bonds secured by a pledge of anticipated revenues. N.J.S.A. 58:5-7, however, confers on the Commission all necessary powers incident to corporate bodies. N.J.S.A. 14A:3-1(1) (g) explicitly empowers corporations "to make contracts and guarantees and incur liabilities, borrow money, issue its bonds, and secure any of its obligations by mortgage of or creation of a security interest in all or any of its property, franchises and income * * *." N.J.S.A. 58:5-9 implies the right of the Commission in its own name to incur necessary indebtedness, subject only to the limitation expressed in N.J.S.A. 58:5-39, that no lien may be placed on physical plant. This specific limitation is imposed by the Water Transmission Facilities Act, L. 1962, c. 167, § 9. It is to be noted that there is no such restriction on the power of North Jersey to issue its own bonds secured by a pledge of anticipated revenues found in this legislation or in the earlier statute. Further, N.J.S.A. 58:5-28 appears to limit the bonding power of a member municipality to the original contract amount, implying that additional expenditures may be financed directly by the Commission by its own bonds secured by anticipated revenues.
It is suggested that the Water Transmission Facilities Act is inapplicable in this context since it refers in general to facilities for the distribution of water made available by the State. As earlier noted, however, this act is in pari materia with the antecedent legislation and in this sense explicates the functions and powers of the Commission. N.J.S.A. 58:5-33 declares the public policy of the State to foster and promote the treatment, filtration and use of water supplies *269 developed by the State. It provides further that public corporations be enabled to finance and construct necessary facilities for the distribution of "water made available by the State to municipalities and persons, pursuant to the provisions of the Water Supply Law." North Jersey is specifically included. N.J.S.A. 58:5-34(2). And N.J.S.A. 58:5-42 through 51 grants the Commission the broadest powers to pledge its revenues to secure bonds issued for the purpose of carrying out such powers. While the authority thus granted is reasonably clear, it does not, in our view, negative a comparable power vested in the Commission under the earlier legislation. We conclude, therefore, that the trial court properly determined that North Jersey was empowered to issue bonds secured by anticipated revenues in connection with the proposed filtration plant.
For the foregoing reasons, the judgment below is affirmed. No costs.
NOTES
[*] At the inception of this litigation, and generally throughout the proceedings, reference has been made to the Department of Health. However, all of the functions, powers and duties heretofore exercised by that Department and the Public Health Council relating to water supplies, including the authority vested by chapter 11 of Title 58, N.J.S.A. 58:11-1 to 48, have been transferred to the Division of Environmental Quality and the Commissioner of the Department of Environmental Protection. L. 1970, c. 33, § 10; N.J.S.A. 13:1D-7.